**AFFIDAVIT IN SUPPORT OF**
**APPLICATIONS FOR SEARCH WARRANTS**

I, Lisa A. Crandall, depose and state as follows:

**Introduction and Agent Background**

1.      I have been employed as a Special Agent of the FBI since June 2010 and I am currently assigned to the Boston Division, Providence Resident Agency.  While employed by the FBI, I have investigated federal criminal violations related to, among other things, crimes against children, to include online sexual exploitation of children.

2.      I am currently assigned to an investigation of DAVID ROMERO REYES ("REYES") for multiple child sexual exploitation offenses, as described in part below.  On April 23, 2021, a federal grand jury in the District of Rhode Island returned a two-count indictment charging REYES with one count of 18 U.S.C. § 2423(a) (Transportation of a Minor with intent to engage in criminal sexual activity) and one count of 18 U.S.C. § 2423(b) (Interstate Travel with intent to engage in illicit sexual activity).  Notwithstanding, the investigation into REYES continues and additional counts or charges may be brought.

3.      I make this affidavit in support of applications for search warrants for the following devices (collectively, the "**Target Cellular Devices**"):

     a.      Information associated with a cellular telephone assigned phone number **(571)621-3000 ("Target Device 1")** that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information

described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

   b.      Information associated with a cellular telephone assigned phone number **(571) 331-4188 ("Target Device 2")** that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B.   Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C § 2423(a) (transportation of a minor with intent to engage in criminal sexual activity), 18 U.S.C § 2423(b) (interstate travel with intent to engage in illicit sexual activity) and 18 U.S.C § 2422(a) (enticement or coercion of a minor to engage in criminal sexual activity) have been committed and that there will be evidence contained within the **TARGET DEVICES**. There is also probable cause to search the information described in Attachment A for evidence, fruits, and instrumentalities of these crimes as further described in Attachment B.

5.      The statements contained in this affidavit are based in part on:  information provided by FBI Special Agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; information gathered from the service of administrative subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation and analysis by FBI agents/analysts and

2

computer forensic professionals; and my experience, training, and background as a Special Agent with the FBI.  Because this affidavit is submitted for the limited purpose of securing authorization for the requested search warrant, I have not included each and every fact known to me concerning this investigation.  Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested warrant.

### STATEMENT OF PROBALE CAUSE

6.   On Friday April 2, 2021, a 2021 tractor trailer truck attempted to enter the United States Navy base Naval Station Newport, located in Newport, Rhode Island, to pick up a shipment.  Prior to the tractor trailer entering the base, the NAVSTA Newport Police (Naval Station Newport Police) conducted a criminal inquiry on the operator of the tractor trailer, David Romero REYES ("REYES"), age 50, year of birth 1970.  Records identified that there was an outstanding warrant for REYES from Texas for Felony Sexual Assault of a Child. REYES was taken into custody by NAVSTA.

7.   NAVSTA Newport Police conducted an inventory of the tractor trailer prior to releasing it to Ronnie's Towing.   During the inventory a minor female, MINOR A, was located in the sleeping area of the tractor.  MINOR A was later identified as being a 15-year-old female reported missing from Virginia since July 26, 2020, when she was 14 years old.

8.   U.S. Department of Health and Human Services documents found in possession of MINOR A indicated that in May 2020 MINOR A was removed from a Houston, Texas immigration detention facility by REYES, who was identified as a "distant relative."

9.   Upon questioning, MINOR A told police that REYES was her uncle and REYES told police that MINOR A was his daughter.  During a preliminary interview of MINOR A, no disclosures of sexual contact with REYES were made.

3

10. Two Apple iPhones, one black iPhone with a blue and gray case assigned telephone number 571-621-3000 and one black iPhone with a gray case assigned telephone number 571-331-4188, were seized on April 2, 2021 by the Rhode Island State Police from REYES and MINOR A respectively.

11. MINOR A was brought to Hasbro Children's Hospital for a medical examination.  Hasbro Children's Hospital determined that MINOR A was approximately five months pregnant[1].

12. On Saturday, April 3, 2021, REYES consented to a recorded interview with the Rhode Island State Police.  Prior to questioning REYES was provided with and waived his Miranda rights. REYES initially denied any sexual relationship with MINOR A. REYES later admitted to having sex on multiple occasions with MINOR A to include in his residence in Virginia as well as in his trucks he drove in various states to include New Jersey, New York, and Connecticut.  REYES stated that MINOR A loved him and he loved MINOR A. REYES said he was not aware of MINOR A having any other boyfriends and never received payment in exchange for others engaging in sex with MINOR A.  REYES estimated that he had sex with MINOR A approximately once per week since August 2020, although he subsequently claimed the last time he had sex with MINOR A was about a month ago. REYES stated that the current trip originated in Virginia within the prior two weeks and included stops in multiple states.  REYES stated that the night/morning of April 2, 2021, they slept in the truck in Connecticut before traveling on to Rhode Island.  REYES claimed he did not have sex with MINOR A in the tractor trailer he was stopped in, which he stated he recently obtained within the past two weeks.  The truck had one bed in the sleeper compartment.

---

[1] Subsequent medical evaluations estimate the pregnancy is further along, with an estimated due date in early June 2021, but still consistent with MV's belief she became pregnant in October 2020.

Based on my training and experience in child sexual exploitation investigations, I believe individuals such as REYES who are in an ongoing sexual relationship with a minor such as MINOR A, and have custody and control of such minor, manifest an ongoing intent to engage in sexual activity with the minor until such time as they are stopped.

13. On Saturday April 3, 2021, REYES identified his telephone number as (571) 621-3000 to the Rhode Island State.

## HOUSTON POLICE DEPARTMENT RECORDS

14. Records obtained from the Houston Police Department document an intake report filed with Child Protective Services in Texas[2] and dated 07/10/2020, was filed by MINOR A's aunt in Virginia, hereinafter Witness 1[3].   Within the CPS intake report, Witness 1 alleged that while MINOR A was in Houston, MINOR A had sex with REYES. It was noted at the time of the report that MINOR A was no longer in Houston and that MINOR A had been residing in Virginia for the past three weeks.

15. Information obtained from Houston Police Department identified that a MINOR A's mother was contacted by Houston PD via telephone. The mother of MINOR A stated that she knows her daughter previously moved to Virginia and was living with Witness 1.    The mother of MINOR A stated that she already reported her daughter missing and she does not have any idea where MINOR A was presently living. The mother of MINOR A stated that REYES was a family friend to MINOR A's father, and that the two grew up together.  MINOR A's father is currently

---

[2] A CPS report was also filed in Virginia, however Virginia stated that they did not have jurisdiction.

[3] Witness 1's identity is known to law enforcement. Within Houston Police Department reports REYES is noted as being Witness 1's uncle.

5

residing in EL Salvador.  MINOR A's mother does not have regular contact with MINOR A's father.

16. Houston Police Department contacted Witness 1 via telephone.  Witness 1 stated that she was at odds that REYES had bought a MINOR A a phone and became suspicious of their relationship after viewing a text message REYES sent MINOR A, which Witness 1 observed while MINOR A was showing Witness 1 a TikTok[4] video on her phone. Witness 1 stated that after confronting MINOR A about her relationship with REYES, MINOR A disclosed that she had sex with REYES in Texas (while living with her mother).  Witness 1 also confronted REYES, stating, "I can't believe you are a 50 year old man having sexual intercourse with a 14-year-old child." REYES responded stating it was not his fault as MINOR A came onto him and pressured him into doing this.

17. Witness 1 stated that she had learned that REYES was having sexual relations with MINOR A's mother and aunt while in Texas.    Prior to late June, 2020, MINOR A was residing with her mother in Texas and was then driven from Houston to Virginia by REYES.  MINOR A lived with Witness 1 in Virginia from approximately June 23, 2020 to July 26, 2020, when she went missing.

18. Witness 1 identified MINOR A as departing Witness 1's residence on July 26, 2020, on her bike at approximately 8:43pm.  MINOR A was then picked up by REYES operating a blue 2014 Dodge Ram pickup truck with temporary Texas Plate #76670A1.

---

[4] Tiktok is a video sharing social networking service owned by the Chinese company ByteDance.  The social media platform is used to make a variety of short-form videos that have a duration from fifteen seconds to one minute.

6

## PRESERVATION REQUEST

19. On April 5, 2021, a preservation request was sent to T-Mobile requesting T-Mobile preserve records related to telephone numbers (571) 621-3000 and (571) 331-4188.

## INTERVIEW OF MINOR A

20. On Friday April 9, 2021 a forensic interview of MINOR A was conducted in Providence, RI.  The interview was conducted by an FBI forensic interviewer in Spanish.  I observed remotely with the assistance a Rhode Island State Police detective fluent in Spanish.  I have not reviewed a formally translated transcript of the interview and relay the below based my on my memory and notes of the interview.

21. Among other things, during the forensic interview, MINOR A disclosed that she and REYES had sexual relations on multiple occasions in various locations.  She was not certain of the exact number or locations of all of the sexual activity.  MINOR A and Reyes were often living in trucks REYES drove and she did not always know where they were.  She stated that she remembers sexual activity occurred in hotels in Manassas, VA, and Laurel, MD, as well as Witness 1's residence and in the sleeping compartment of the tractor trailer truck(s) on multiple occasions.

22. MINOR A further stated she was released to REYES' custody from an immigration facility in Texas and the two quickly began developing a romantic relationship.  REYES provided for MINOR A and told MINOR A that all the money he earned was for both of them.  MINOR A resided in the Houston, TX area with her mother and other relatives for several weeks but eventually left Texas with REYES and began living in VA with REYES's niece (MINOR A's cousin), referred to above as Witness 1.   MINOR A disclosed that in Virginia, MINOR A and REYES had a conversation with Witness 1 in which they disclosed to Witness 1 that they were in a sexual relationship.  MINOR A said she and REYES falsely claimed that that they had sex in

7

Texas in order to conceal the fact they actually had sex in Witness 1's home. MINOR A was asked about an incident described in a police report which stated that REYES put a knife to his throat and stated words to the effect of "I would rather die than go to jail for what I did to you." MINOR A stated that REYES was very nervous when Witness 1 confronted him and said he could go to jail for rape, and that REYES did have a pocket knife, but that REYES was not actually suicidal.

23. MINOR A stated she believed that Witness 1, then told MINOR A's father, in El SALVADORE about the relationship between REYES and MINOR A, leading to a protective order prohibiting contact between REYES and MINOR A. (I have not independently confirmed the existence of this protective order). According to MINOR A, shortly thereafter, REYES came to Witnesses 1's home and gave MINOR A a phone during a family party. REYES told her not to tell anyone about it and walked away. MINOR A then used the phone to contact REYES. MINOR A departed Witness 1's home from the later that evening and REYES picked up MINOR A nearby.

24. After that MINOR A lived with REYES as his "woman." MINOR A would cook and REYES provided. The two travelled in trucks everywhere together during the week. MINOR A recalled there were four different trucks at various times. On weekends, REYES and MINOR A initially stayed in hotels and eventually rented a basement apartment for weekends. There was one bed in two of the four trucks and sometimes they would sleep together and sometimes she would sleep at different times than him. MINOR A stated that the other two trucks had bunk beds. The truck MINOR A was found in had one bed.

25. During the week, MINOR A would travel in the truck with REYES wherever he went. MINOR A was not in school. There were trips to multiple states. MINOR A said sex between the two was not planned but would occur periodically. MINOR A did not specifically recall the last time they had sexual contact. MINOR A believes she became pregnant in October of 2020.

8

MINOR A stated she believes REYES is the father because she has only had sex with REYES. MINOR A said REYES purchased a pregnancy test for her at some point.

26. MINOR A stated that REYES would claim MINOR A was his daughter if questioned by anyone.  REYES took the documents given to her when he picked her up from the immigration facility to use as proof.  (It should be noted these documents are written in English and describe REYES as a "distant relative"). MINOR A stated that on at least one occasion REYES's boss saw her in the truck but REYES said she was his daughter.  MINOR A said that otherwise no one knew she was in the truck.

## TRUCKING RECORDS

27. I have reviewed records provided by FEMA TRUCKING LLC.  According to the electronic logging device records, which contain daily logs, REYES used the name David ROMERO.  According to the records, between February 1, 2021 and April 2, 2021, there were six dates, including April 2, in which the truck REYES was driving travelled in or through Rhode Island. Those dates are February 8, February 9, February 11, March 21, March 29 and April 2.

## NEED FOR REQUESTED RECORDS

28. The records requested for the **Target Cellular Devices** are necessary for investigators to determine the location and corresponding dates of travel of REYES and MINOR A.  The acquisition of the records described in Attachment B would likely provide investigators with clarity, including determining the location of REYES and MINOR A relative to each other, as most individuals keep their phones with them everywhere they go..

29.     The records will also help establish the user for each device, which is necessary for evidentiary purposes in potential future proceedings, by analyzing the phone numbers in contact

9

with the **Target Cellular Devices**. Furthermore, investigators plan to compare the phone numbers in contact with one or both of the **Target Cellular Devices** against the tower dump records to determine if any of their contacts may have been present for one or more of the incidents. In other words, an analysis of the phone numbers in contact with the **Target Cellular Devices** will enhance user attribution and could possibly lead to the identification of other co-conspirators.

30.     In addition to requesting records of usage, the content of voicemail recordings and text messages associated with the **Target Cellular Devices** is also requested[5]. Both types of content can provide law enforcement with insight into the activities of the user of a cellphone. Oftentimes, voicemail recordings are messages left for the user of a cellphone as a follow-up to previous conversations. Consequently, these one-sided audio recordings can assist in providing context to the records of usage. Likewise, the content of text messages provides law enforcement with even more clarity as to the activities of the user of a cellphone. The text message content represents the exact words sent and received by the user during the communications observed in the records of usage.

31.     Information is being sought for the time frame of July 23, 2020 to April 2, 2021. This time frame encompasses the approximate duration of the time that MINOR A received TARGET DEVICE 2 from REYES until the date MINOR A was recovered by law enforcement. Oftentimes by limiting the scope of the time frame for which records are sought, law enforcement is unable to identify a pattern of life for a suspect and may interpret data for a single day incorrectly when/if compared against a slightly wider time frame. By requesting the complete time frame of

---

[5] Most cellular providers, to include those associated with the **Target Cellular Devices**, retain and can oftentimes provide the content of voicemail recordings. On the contrary, cellular providers are less likely to retain text message content, however, that is subject to change without notice to law enforcement.

records, your Affiant believes law enforcement will be able to identify a pattern of life for REYES and MINOR A which will reveal the location and dates of their travels.

## OVERVIEW OF RELEVANT TECHNOLOGY

32.     In my training and experience, I have learned that T-Mobile provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

33.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the Subject Phones.  I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

34.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided

11

by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the users of the Subject Phones and may assist in the identification of co-conspirators and/or victims.

## CONCLUSION

35.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

36.     I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on T-Mobile who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

37.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

_____

Lisa A. Crandall
Special Agent
Federal Bureau of Investigation

Attested to be the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by **Telephone.** *(specify reliable electronic means)*

_____          _____
*Date*                                                            *Judge's signature*


_____          _____
*City and State*                                              *Printed name and title*

13

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the following phone numbers:

- Cellular telephone assigned phone number **(571)621-3000 ("Target Device 1")** that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

- Cellular telephone assigned phone number **(571)331-4188 ("Target Device 2")** that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

Each of these numbers is individually referred to as the "Account" in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period July 23, 2020 through April 2, 2021:

a.   The following information about the customers or subscribers of the Account:

i.    Names (including subscriber names, user names, and screen names);

ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.  Local and long distance telephone connection records;

iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.    Length of service (including start date) and types of service utilized;

vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

15

        viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.  All records and other information relating to wire and electronic communications sent or received by the Account, including:

        i.   Records of user activity for each connection made to or from the Accounts, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

        ii.   Information about each communication sent or received by the Accounts, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers);

        iii.   All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Accounts, to include all <u>voice, SMS, MMS, and data activity</u>; and

        iv.   All records containing round-trip-distance measurements and/or timing advance information for each connection made to or from the Accounts (GSM, CDMA, EVDO, UMTS, LTE, etc.), to include NELOS, RTT, True Call Measurement Data, PCMD records, and Reveal Reports.

c.  All incoming and outgoing voicemail recordings and text message content associated with the Account(s).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. § 2423(a) (Transportation of a Minor with intent to engage in criminal sexual activity) 18 U.S.C § 2423(b) (interstate travel with intent to engage in illicit sexual activity) and 18 U.S.C § 2422(a) (enticement or coercion of a minor to engage in criminal sexual activity).

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC**
**RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE**
**902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.   I am employed by T-Mobile and my title is _____.   I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of T-Mobile. The attached records consist of _____.

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile, and they were made by T-Mobile's a regular practice; and

b.      such records were generated by T-Mobile's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-Mobile in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by T-Mobile, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                     Signature